# In the United States Court of Federal Claims

No. 11-297C
(Filed: January 21, 2016)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | |
| **DAVITA HEALTHCARE PARTNERS,** | * | |
| **INC. (f/k/a/ DAVITA INC., f/k/a TOTAL** | * | **Motion In Limine**; Electronic |
| **RENAL CARE HOLDINGS, INC., f/k/a** | * | Discovery; Electronically Stored |
| **MEDICAL AMBULATORY CARE** | * | Information; Amendments to |
| **DELAWARE, INC.), and PHYSICIANS** | * | Fed. R. Civ. P. 1 and 37; Rule |
| **DIALYSIS, INC., and PHYSICIANS** | * | 37(c); Fed. R. Evid. 1006. |
| **DIALYSIS VENTURES, INC., and 175** | * | |
| **DIALYSIS CENTER OWNERS (d/b/a** | * | |
| **1,462 DIALYSIS CENTERS),** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

Bobby R. Burchfield and Matthew M. Leland, King & Spalding LLP, 1700 Pennsylvania Avenue, NW, Suite 200, Washington, D.C. 20006, and Paul M. Thompson, McDermott Will & Emery LLP, 500 North Capital Street, NW, Washington, D.C. 20001, for Plaintiffs DaVita HealthCare Partners Inc. and 1,236 Dialysis Center Owners (Wholly Owned Entities).

Jason A. Levine and Melissa Velarde Hastings, Vinson & Elkins LLP, 2200 Pennsylvania Avenue, NW, Suite 500 West, Washington, D.C. 20037, for Plaintiffs 175 Dialysis Centers (Joint Venture and Managed Entities).

Benjamin C. Mizer, Robert E. Kirschman, Jr., Martin F. Hockey, Jr., John S. Groat, Alexander O. Canizares, and Joshua D. Schnell, United States Department of Justice, Civil Division, Commercial Litigation Branch, PO Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Drew Cornacchio, Department of Veterans Affairs, Office of General Counsel, of Counsel.

**OPINION AND ORDER**

**WILLIAMS**, Judge

This matter comes before the Court on Defendant's motion in limine, seeking to exclude from the record data produced after the close of discovery and alleged summaries.[1] For the reasons stated below, Defendant's motion is denied.

**Background**[2]

In this action, Plaintiffs claim that the United States Department of Veterans Affairs ("VA") underpaid for dialysis services Plaintiffs provided pursuant to both express contracts and regulations. The instant discovery dispute concerns the VA's alleged failure to pay Plaintiffs amounts required under regulation for services rendered pursuant to authorizations.

Under 38 C.F.R. § 17.52(a), the VA may use individual authorizations to furnish medical services when there is infrequent demand for such care or services. Section 17.56 governs payment for dialysis services provided pursuant to authorizations. The version of § 17.56 effective from March 7, 2005 until February 14, 2011, provided:

Payment for non-VA physician and other health care professional services.

(a) Except for anesthesia services . . ., payment for non-VA health care professional services associated with outpatient and inpatient care provided at non-VA facilities authorized under § 17.52 or made under § 17.120 of this part, shall be the lesser of the amount billed or the amount calculated using the formula developed by the Centers for Medicare and Medicaid Services' (CMS) participating physician fee schedule for the period in which the service is provided. This payment methodology is set forth in paragraph (b) of this section. If no amount has been calculated under Centers for Medicare and Medicaid Services' participating physician fee schedule or if the services constitute anesthesia services, payment for such non-VA health care professional services associated with outpatient and inpatient care provided at non-VA facilities . . . shall be the lesser of the actual amount billed or the amount calculated using the 75th percentile methodology set forth in paragraph (c) of this section; or the usual and customary rate if there are fewer than 8 treatment occurrences for a procedure during the previous fiscal year.

---

[1] The Court also addresses motions relating to ongoing discovery disputes.

[2] Detailed background and procedural history is set forth in this Court's Opinion of March 28, 2013, DaVita, Inc. v. United States, 110 Fed. Cl. 71, 75-78 (2013).

\* \* \*

 (c) Payment under the 75th percentile methodology is determined for each VA medical facility by ranking all occurrences (with a minimum of eight) under the corresponding code during the previous fiscal year with charges ranked from the highest rate billed to the lowest rate billed and the charge falling at the 75th percentile as the maximum amount to be paid.

\* \* \*

 (e) Payments made in accordance with this section shall constitute payment in full. Accordingly, the provider or agent for the provider may not impose any additional charge for any services for which payment is made by VA.

38 C.F.R. § 17.56 (2005) (internal citations omitted).

  In 2008, without amending 38 C.F.R. § 17.56, the VA announced that effective January 1, 2009, it would begin reimbursing dialysis providers at Medicare rates, instead of the 75th percentile rate specified in the regulation. Third Am. Compl. ¶ 53, Ex. F. On July 29, 2009, the VA issued a memorandum rescinding its 2008 announcement effective July 24, 2009, because "the decision to implement utilization of Medicare fee schedules to pay for care and services other than physician and non-physician professional services did not comply with provisions of the Administrative Procedure Act." Id. at Ex. F. On November 18, 2009, the VA's National Fee Program Office Manager issued a letter to providers stating that in the absence of a contract, pursuant to 38 C.F.R. § 17.56(a), the VA would reimburse providers for claims filed between January 1, 2009, and June 24, 2009, at the lesser of the actual amount billed by the provider or the 75th percentile methodology set forth in 38 C.F.R. § 17.56(c). Id. at Ex. G. The VA informed providers that it would reconsider claims for dialysis services that had been erroneously reimbursed at Medicare rates if submitted to the Financial Services Center within 90 days. Id. On December 17, 2010, the VA amended its regulations to allow for providers to be paid at the Medicare rate effective February 15, 2011. Id. at ¶ 32 (citing 75 Fed. Reg. 78,901 (Dec. 17, 2010)).

  DaVita provided dialysis services via authorizations from 2005 through February 15, 2011. Id. at ¶¶ 36, 65. DaVita seeks reimbursement for alleged underpayments for these noncontract services provided from 2005 to January 1, 2009, and from between July 25, 2009, and February 15, 2011. Id. at ¶ 70. For dialysis services between January 1, 2009, and June 24, 2009, DaVita resubmitted its noncontract claims to the Financial Services Center, as advised in the November 18, 2009 letter from the VA, directing dialysis providers to submit prior dialysis claims to be reimbursed at the 75th percentile rate. Id. at ¶ 53. When the Financial Services Center denied the resubmitted claims, DaVita appealed the denials to specific Veterans Affairs Medical Centers, as the Financial Services Center had instructed. DaVita alleges that the VA still owes "substantial sums on these claims." Id. at ¶ 65, 67.

## Procedural History and the Instant Discovery Dispute

  On May 12, 2011, after the Contracting Officer denied DaVita's contract-based claim and the Financial Services Center denied its authorization-based claims, Plaintiffs filed a complaint in this Court. The parties have since engaged in contentious and prolonged discovery and

motions practice, spanning multiple years and including 17 proceedings before this Court, totaling over 23 hours. Thirteen motions for enlargement of time have been filed by Defendant, nine by Plaintiffs, as well as two joint motions. On March 28, 2013, the Court denied Defendant's motion to dismiss. DaVita, Inc. v. United States, 110 Fed. Cl. 71, 75-79 (2013).

This matter comes before the Court on Defendant's motion in limine to exclude certain data Plaintiffs produced in response to discovery requests. Defendant's motion relates to two categories of Plaintiffs' production of documents: (1) all documents produced after the close of fact discovery on December 10, 2014, and (2) alleged summaries. Both the alleged late productions and summaries reflect claims submitted to the VA for dialysis services provided to veterans by Plaintiffs under authorizations. The documents themselves are described to be "voluminous datasets" and are not before the Court in their entirety.

Plaintiffs maintain four data systems from which data were produced relevant to the instant dispute: Focus, Bar, Spider, and ePremis. Def.'s Suppl. Br. 4-5. In making their initial data production on December 3, 2013, Plaintiffs determined that data from their Spider data warehouse would be sufficient to substantiate and evaluate their noncontractual claims, because this Spider data was consistent with the data stored in the other data systems. Pls.' Suppl. Br. 4. Plaintiffs therefore did not produce data from the remaining three data storage systems, Bar, Focus, and ePremis. Id. at 4-5.

Plaintiffs describe their initial, pre-discovery cutoff data production, on December 3, 2013, as "searchable non-contracted claim data" consisting of "the payment, claim-level, and charge-level data on services provided to ailing veterans." Id. at 3. Plaintiffs elaborate:

> "Claim-level data" are the invoice data showing total amounts billed, and later paid, on a single invoice form. "Charge-level data" are the individual charges on the invoice; a single invoice may have many charges for multiple dialysis sessions, medications, and other items.

Id. at 5.

Though Plaintiffs performed quality checks on the December 3, 2013 production, they identified problems with the production late in discovery. In responding to Defendant's September 18, 2014 interrogatories, Plaintiffs represented that they:

> [I]nvestigated whether there were any discrepancies among the charges on the claims delivered to the VA. After comparing December 3, 2013 claim data with the data stored in its other data systems, Plaintiffs discovered some differences. Plaintiffs alerted the Government to the claim anomalies at the November 10, 2014 status conference and agreed to produce data from all its data sets.
>
> As promised, Plaintiffs produced the remaining relevant claim data [from Bar, Focus, and ePremis] in rolling productions on November 18, 2014, December 19, 2014, January 16, 2015, and January 28, 2015.

Pls. Opp'n 10 (internal citations omitted). Plaintiffs subsequently made another production on March 17, 2015, replacing an earlier post-discovery production that Defendant contends "suffers from the same defects as the other late productions . . . ." Def.'s Suppl. Br. 13 n.3.

After filing its motion in limine, Defendant filed a motion to reopen discovery for the purpose of deposing Plaintiffs' 30(b)(6) witness regarding Plaintiffs' productions. The Court authorized the deposition and reopened discovery for that limited purpose. On June 9, 2015, Defendant deposed Plaintiffs' 30(b)(6) witness, David Corlett, Senior Director of Revenue Operations for DaVita Healthcare Partners, Inc., for four hours on the following topics:

>(1) Claim data produced after the December 10, 2014 fact discovery deadline; i.e., data on specific veteran dialysis claims at issue including both claim-level and charge-level data;
>
>(2) The content of the post-December 10, 2014 productions;
>
>(3) The reasons why productions were made after the close of fact discovery; and
>
>(4) How Plaintiffs gathered the information included in the post-December 10, 2014 productions, including the specific sources from which the data came.

See Order (May 19, 2015). The deposition testimony of Mr. Corlett comprised 190 pages, and counsel for both parties questioned the witness. See Pls.' Suppl. Br. Add. 039-89. Following the deposition, the parties filed supplemental briefs.

## Discussion

Defendant moves to exclude Plaintiffs' December 19, 2014, January 16, 2015, January 28, 2015, and March 17, 2015 data productions, in their entirety, from being used for any purpose in this litigation because, in Defendant's view, these documents were not timely produced. The productions contain millions of lines of charge- and claim-level data regarding non-contractual claims by Plaintiffs. Plaintiffs responded, arguing that the extreme sanction of exclusion is not warranted for the untimely productions because Plaintiffs produced relevant and responsive documents during discovery and only produced additional documents after identifying "anomalies" and "discrepancies" within the documents that had been timely produced. Pls.' Opp'n 10. Specifically, Plaintiffs note that "[a]lthough Plaintiffs produced all claim-level data from each of their transactional data systems by November 18, 2014, Plaintiffs' charge-level data productions required significantly more time." Pls.' Suppl. Br. 5. The subsequent data productions consisted of this "charge-level data." Id. Plaintiffs argue that "[a]lthough there are several million charges listed in each of the data productions, the data sets contain an overlap of most claims and charges. Accordingly, Plaintiffs have not produced completely 'new' information." Pls.' Opp'n 10 (citing Rose Decl. ¶ 7); see also Pls.' Suppl. Br. 4 ("Plaintiffs discovered some discrepancies among their billing data sets for a small number of claims (less than 2%) that they delivered to the VA.") (citing Corlett Dep. 97-100, 104-07, 120-21) (Dec. 5, 2014)). Plaintiffs further explain that their January 28, 2015 production simply replaced their production made earlier that month in order to correct a formatting error, while their March 17, 2015 production similarly replaced the earlier production because a data field had been unintentionally omitted. Pls.' Suppl. Br. 6.

Defendant also moves to exclude the December 3, 2013, November 18, 2014, and November 26, 2014 "claim-level data" productions, claiming they are summaries for which the underlying data was not provided, citing Federal Rule of Evidence 1006.

5

**Untimely Productions**

Defendant moves to exclude the untimely productions under Rule 37(c), which provides:

> If a party fails to provide information or identify a witness as required by RCFC 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

RCFC 37(c)(1).[3]  This Court considers the following factors in determining whether to exclude evidence under Rule 37(c):

(1) the importance of the information withheld;

(2) the prejudice or surprise to the party against whom the evidence is offered;

(3) the likelihood of disruption of the trial;

(4) the possibility of curing the prejudice;

(5) the explanation for the failure to disclose; and

(6) the presence of bad faith or willfulness in not disclosing the evidence.

Zoltek Corp. v. United States, 71 Fed. Cl. 160, 168 (2006) (internal citations omitted).  The first four factors implicate whether the failure to produce was harmless, while the last two factors address whether the failure was substantially justified.  Id. (citing S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596-97 (4th Cir. 2003)).

### The Importance of the Information Withheld

The claim-level and charge-level data from the Focus, Bar, Spider and ePremis data systems included in the post-discovery productions evidence the services for which Plaintiffs claim they were underpaid – information that Defendant acknowledges "goes to the very heart of plaintiffs' claims."  Def.'s Mot. in Lim. 18.  Plaintiffs posit that exclusion of the data could be dispositive, as they rely upon it "to prove the amount of the Government's underpayments" in determining damages.  Pls.' Suppl. Br. 1.  The parties agree that the information that was not timely produced is very important – indeed fundamental – to both Plaintiffs' claims and Defendant's defenses.  This factor thus militates against exclusion of this data.

---

[3]   The version of this rule in the Federal Rules of Civil Procedure was amended effective December 1, 2015, to reflect Rule 26(b)(1)'s narrowing of the scope of discovery to relevant information that is "proportional to the needs of the case" and to contribute to the overall goal of regulating the time and expense of litigation.  Similar changes to the Court of Federal Claims' rules are currently being considered by the Court's Rules Committee.

**Prejudice to Defendant**

Defendant articulates three elements of the prejudice it would suffer as a result of accepting Plaintiffs' late productions. First, Defendant argues that it suffered economic prejudice, asserting that "plaintiffs' late productions have already imposed a significant financial cost on the Government," due to Defendant's claims analysis expert's "considerable time [spent] trying to analyze plaintiffs' data." Def.'s Suppl. Br. at 26. Defendant also claims that the productions "suffer[] from numerous flaws" that have significantly frustrated their expert's analysis. Id. Finally, Defendant claims that it has been prejudiced by being forced to rely upon only the data Plaintiffs determined to be relevant, rather than the entire data set stored by Plaintiffs. Id. at 27.

In support of its claims of prejudice, Defendant submitted the declaration of its healthcare claims and data analysis consultant, Ian Dew,[4] outlining deficiencies and ambiguities in Plaintiffs' production. Def.'s Mot. in Lim. A001-09. Specifically, regarding the untimely productions, Mr. Dew opined that:

- the productions lacked a data dictionary describing the meaning of each field of data produced. Dew First Decl. ¶ 9, Feb. 23, 2015.

- the number of claims records provided exceeded the number of claims of underpayment, making it unclear which records are the correct representation and whether multiple records should be reconciled to form a single claim. Id. at ¶ 10.

- specific data allegedly necessary to compute accurate reimbursements, such as patient weight and height, were omitted. Id. at ¶ 12.

- it is unclear what other data inputs were available but not produced. Id. at ¶ 13.

- it is unclear if the productions are duplicative, or if one supersedes another. Id. at ¶ 11.

Defendant's effort to exclude the late produced data on grounds of economic prejudice fails. While the late productions were voluminous and will require time and expense to review, the majority of the productions are duplicative, and the additional time and effort required of Defendant does not warrant the severe sanction of exclusion of data helpful to both parties in this litigation.

Defendant's claim that the production "suffered from numerous flaws" in ways that frustrated its expert's analysis similarly does not warrant exclusion. On March 26, 2015, to assist Defendant in analyzing the data productions, and to alleviate the concerns of Defendant's data analysis expert, Plaintiffs produced a "data dictionary" which defined relevant terms in the data productions and provided an "order of operations" describing the steps necessary for

---

[4] Mr. Dew is a "senior analyst and vice president with Steck Consulting, LLC and ha[s] over ten years of experience in the analysis of healthcare claims data." Dew Second Decl. ¶ 1, July 6, 2015. Additionally, he has been the "[l]ead data analyst in over 60 healthcare and other fraud investigations for US DOJ Civil Division, State Offices of Attorneys General, and private clients." Def.'s Mot. in Lim. A007.

analyzing the data and "identify[ing] relevant records within the datasets." Pls.' Suppl. Br. 7, 10, 14; Def.'s Suppl. Br. 14-15.

In a July 6, 2015 supplemental declaration, Mr. Dew states that the productions still suffer from omissions of "data necessary to calculate accurate reimbursements for dialysis services" and "ambiguity as to which of the produced claim and charge records are relevant." Dew Second Decl. ¶ 3(a)-(b). However, this concern appears to be focused on omission of patient height and weight, necessary for calculation of Medicare compensation rates, which Plaintiffs argue are irrelevant to their claim. See Pls.' Suppl. Br. 11. Defendant argues that the calculation of Medicare compensation rates is necessary to their defenses of "Payment, Accord and Satisfaction, Estoppel, and Waiver." Def.'s Suppl. Br. 7. Whether Plaintiffs omitted data necessary to determine accurate reimbursement, such as patient height and weight and other available data inputs, are matters to be determined via a motion to compel, not a motion in limine.

Finally, Defendant claims prejudice stemming from Plaintiffs' unilateral determination of which data fields were relevant and included in the productions at issue. Defendant has taken two 30(b)(6) depositions and has not articulated, other than patient height and weight, any missing evidence. Moreover, there is no indication that any other potentially relevant evidence is being withheld. The Court is not persuaded that Plaintiffs' attempts to remedy omissions and anomalies in their original data productions demonstrate that Plaintiffs sought to avoid discovery or hide potentially relevant evidence. The late productions contain evidence vital to Plaintiffs' claims, including claims and charge data on the dialysis services at issue. Nor did Plaintiffs attain any procedural advantage attributable to delayed productions. Given that Plaintiffs cannot obtain interest on their noncontractual claims, delay prejudices Plaintiffs, not Defendant.

### The Likelihood of Disruption of Trial and the Potential to Cure the Prejudice

Defendant argues that the late production of these data sets has prevented Defendant from conducting a proper analysis of their content, but expert discovery is still open, dispositive motions have not yet been fully briefed,[5] and a trial date has not yet been set.

### Substantial Justification for Plaintiffs' Failure to Disclose

"Substantial justification is justification sufficient to satisfy a reasonable person that parties could disagree as to whether compliance with the disclosure requirement was required." Zoltek, 71 Fed. Cl. at 170 (citing 7 James Wm. Moore et al., Moore's Federal Practice § 37.62, at 37-126 (3d ed. 2005); Sheppard v. River Valley Fitness One, 428 F.3d 1, 12 (1st Cir. 2005) (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Chapple v. Alabama, 174 F.R.D. 698, 701 (M.D. Ala. 1997)). This Court is satisfied that Plaintiffs took adequate steps to timely disclose supplemental discovery once they became aware of omissions in their initial production. Pls.' Suppl. Br. 5-7; Corlett Second Dep. 208-12.

---

[5] At Defendant's request, the Court has stayed deadlines for expert disclosures, expert discovery and briefing on dispositive motions until resolution of the instant motion. Order, June 19, 2015; Def.'s Resp. to Pls.' Mot. to Amend Schedule.

Plaintiffs explain that their late productions resulted from their learning late in the discovery process that seemingly redundant data sources contained unique information. Pls.' Suppl. Br. 2. On December 3, 2013, Plaintiffs produced claims data pulled from their data warehouse. Id. at 4 (citing Niemi Decl. ¶¶ 141-43). Former DaVita employee Heather Niemi explained that she and her team compared samples of information in the data warehouse [Spider] against "the actual transactional data system that produced them [Focus and Bar]." Niemi Decl. ¶ 143. In conducting this quality assurance, Ms. Niemi and her team found no discrepancies between the data warehouse and other databases also containing transactional data. Id. Plaintiffs therefore only produced the data from the data warehouse and not the data from any other databases, citing Rule 34(b)(2)(E) as authorizing production of electronically stored information in one form. Pls.' Suppl. Br. 9.

During their own investigations in conjunction with answering subsequent discovery requests – Defendant's September 18, 2014 interrogatories regarding Plaintiffs' dialysis treatment charges – however, Plaintiffs identified "anomalies" in the information produced from the data warehouse. Id. at 4. Specifically, Plaintiffs identified "some discrepancies among their billing data sets for a small number of claims (less than 2%) that they delivered to the VA." Id. During his first deposition on December 5, 2014, Senior Director of Revenue Operations for DaVita Healthcare Partners, Inc., David Corlett, testified that he was confused by Interrogatory 1, which requested that Plaintiffs explain in detail the basis on which Plaintiffs submitted claims to the Department of Veterans Affairs based on Medicare composite rates. He stated the September 18, 2014 interrogatory contained "a reference to claims billed at a Medicare rate and that was counterintuitive to what I understood was contained in the 2013 file. So I instructed my team to perform additional due diligence to see how or if that was indeed the case." Corlett First Dep. 97. This investigation uncovered a number of "anomalies," which "arose in a limited number of instances where a claim had been changed in E-Premis before being submitted to the VA for payment." Def.'s Suppl. Br. 10. Due to the resulting discrepancies for these claims between the various data systems, Plaintiffs produced data from all of their data sets – four separate databases in total. Pls.' Suppl. Br. Add. 16-18 (transcript excerpt from Nov. 10, 2014 status conference).

Plaintiffs made the first of their productions to correct these "anomalies," impacting "less than 2%" of their total claims, on November 18, 2014. This first production encompassed all of Plaintiffs' claim-level data from each of their transactional data systems and contained more than 124,000 lines of data. Pls.' Suppl. Br. 5; Def.'s Mot. in Lim. 13. This claim-level data reflects the total amount billed on a single invoice. Pls.' Suppl. Br. 5. Sub-elements of the claim-level data – the more detailed charge-level data, which included the discrete, individual charges on each invoice, took Plaintiffs significantly more time. Id. According to Mr. Corlett, Plaintiffs could not produce the charge-level data on November 18, 2014, when the claim-level data productions were made, "due to the volume of data; the need to perform extensive [quality assurance]; [and its] desire to provide complete, accurate, sortable, usable information to the VA." Corlett Second Dep. 233. Further, the team compiling the productions "was not involved in the previous December productions, so there was some education that needed to happen of the teammates that were involved." Id. As a result, Plaintiffs made further productions on December 19, 2014, and January 16, 2015, each consisting of millions of lines of charge-level data. Def.'s Mot. in Lim. 14-15. On January 28, 2015, Plaintiffs produced a replacement version of the charge data that had been provided on January 16, 2015, after their data analysis

9

consultant company, Alvarez & Marsal, advised them of a formatting issue which made the data difficult to use.  Corlett Second Dep. 237.

Plaintiffs made their final production on March 17, 2015, consisting of an update of data from two data systems, Spider and ePremis, after Alvarez & Marsal found an omission of a relevant data field in the prior production.  Id. at 239.  The omitted data field, entitled "Units-Old" and stored in the ePremis data system, reflected unit data – the number of procedures performed on a given claim – under an older version of the institutional claim form.  Id.  While the unit data field under the newer version of this form was included, the older unit data was not, because it was stored in a separate data field.  Id.  Mr. Corlett testified that this data point had been omitted inadvertently because "the responsible . . . employees were unaware of the particular data field . . ." and that Plaintiffs acted proactively in providing the missing data to Defendant.  Def.'s Suppl. Br. 14; Corlett Second Dep. 239.  Given the detailed explanations of Ms. Niemi and Mr. Corlett, the Court is satisfied that Plaintiffs have demonstrated substantial justification for their delay in producing the data.

### Bad Faith or Willfulness in Not Disclosing the Evidence

Defendant argues that Plaintiffs' late productions were the result of a pattern of intentionally withholding information.  Defendant contends that it sought the information from the seemingly redundant systems throughout discovery, but Plaintiffs repeatedly resisted by arguing that production would be overbroad and unduly burdensome.  Def.'s Suppl. Br. 20.

Defendant's chief complaint appears to be its perception that Plaintiffs fabricated their claim that production of electronically stored information ("ESI") from all four data sets was unduly burdensome.  This argument is not supported by the record.  In order to demonstrate that Plaintiffs' data was readily accessible, Defendant relies solely on the testimony of Heather Niemi, then Director of DaVita, Inc.'s Revenue Operations Department.  Defendant characterizes Ms. Niemi as testifying that ESI on her computer could be produced within half an hour.  Def.'s Mot. in Lim. 16.  However, Ms. Niemi's testimony was different – she testified that extracting the data previously produced in a single production in December 2013, from her laptop and shared file would only take a half an hour, "[s]ince it already exists."  Niemi Dep. 231-33.  This is not inconsistent with the declaration of Stephan Gordon, a Senior Data Analyst at DaVita Healthcare Partners, Inc., filed in response to Defendant's second motion to compel.  Gordon Decl. ¶ 4.  Mr. Gordon testified that collection of all ESI related to VA authorization forms, invoices, and payment records for dialysis and related services would take in excess of 9,960 full-time equivalent hours to collect and prepare for production.  Gordon Decl. ¶ 18.  Ms. Niemi, on the other hand, testified regarding only a small subset of the information that had already been collected.  Niemi Dep. 231-33.

There is no evidence that Plaintiffs' late production was done in bad faith.  Ms. Niemi testified that she checked the data in the data warehouse using a sampling technique, and found no discrepancies.  When discrepancies were found later in discovery, Plaintiffs identified them and produced all data they believed to be relevant from all of their repositories.  Given the volume of data and the amount of time required to produce such data, it is not surprising that mistakes were made.

10

In this advanced technological era, where the quantity of retrievable electronic data is so massive, the civil discovery process has become daunting, unwieldy, and far too expensive. Recognizing the growing trend of increased litigation costs and delays due to electronic data discovery, the drafters of the Federal Rules of Civil Procedure ("FRCP") have recently adopted several amendments to the Rules aimed at preventing abuses and encouraging cooperation and civility. Rule 1 of the FRCP has been amended to provide that the R

ules "be construed, administered, and employed by the court and the parties to secure the just, speedy and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (2015). This amendment was made in order to "make clear that <u>parties</u> as well as courts have a responsibility to achieve the just, speedy, and inexpensive resolution of every action." Comm. On Rules of Practice and Procedure, Rep. of the Judicial Conf. to the Chief Justice of the U.S. and Members of the Judicial Conf. of the U.S., at App. B-13 (Sept. 1, 2014) (emphasis added). Although the Committee Note on Rule 1 provides that no new sanctions will stem from this amendment, it also explains that "discussions of ways to improve the administration of civil justice regularly include pleas to discourage over-use, misuse, and abuse of procedural tools that increase cost and result in delay. Effective advocacy is consistent with – and indeed depends upon – cooperative and proportional use of procedure."[6] <u>Id.</u> (internal quotation marks omitted).

**Plaintiffs' December 3, 2013, November 18, 2014, and November 26, 2014 Productions Are Not Prohibited by Rule 1006**

Defendant argues that the Court should exclude Plaintiffs' claims data productions of December 3, 2013, November 18, 2014, and November 26, 2014, on the ground that Plaintiffs have not complied with Federal Rule of Evidence 1006 in producing them. Def.'s Mot. in Lim. 21. Defendant asserts, based on the deposition testimony of Ms. Niemi, that Plaintiffs' December 2013 production was:

> a sub-set of data "copied" from DaVita's Spider data warehouse to a shared drive and laptop computer for further analysis. The data produced was assembled, under the direction of counsel, solely for the purposes of this litigation. The spreadsheets did not pre-exist this dispute. Moreover, the data consisted of

---

[6] In addition, Fed. R. Civ. P. 26 has been amended to narrow the scope of discovery from any relevant information which might lead to admissible evidence to a more limited scope - - information which is:

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1) (2015).

The Federal Rules have also been amended to require more specificity in responses and objections to discovery requests. <u>See</u> Fed. R. Civ. P. 34 (2015).

11

>certain information that plaintiffs chose to include while excluding other data, such as data plaintiffs assert could "potentially" be pursuant to contracts.

Id. at 22 (citing Niemi Dep. 133). Defendant curiously asserts that the defined sub-set of claims data constitutes a "summary" of a larger data set which Plaintiffs have failed to provide to Defendant for inspection as required by Rule 1006. Id. at 22-23. Defendant argues that the November 18 and 26, 2014 productions suffered from the same error as the December 3, 2013 productions, and should also be excluded. Id. at 22-23. While Defendant does not explicitly state what the allegedly omitted larger data set is, in Defendant's view all three productions represent summaries of data extracted from Plaintiffs' data systems, rather than productions of the underlying data, because only certain data fields have been produced. Defendant further notes that the data have been produced in a spreadsheet form rather than in their native format. Def.'s Suppl. Br. 29.

Plaintiffs argue that these documents are not summaries, but instead that the claims data productions "are duplicated from the actual information that DaVita stores in the ordinary course of business . . . ." Pls.' Opp'n 18. The record supports Plaintiffs' argument. Ms. Niemi testified in a declaration that, "[a]lthough the data DaVita produced are in a different format than they are stored in the data warehouse, there was no change to the content of the data." Niemi Decl. ¶ 12. Plaintiffs point out that the data was reformatted so it would be useable. Id. As Ms. Niemi testified:

>To ensure the information would be user-friendly to the Government, we converted the data into "comma-separated format," which can be opened as a spreadsheet in any Microsoft Excel program. This allowed each user to search for and view information on each claim charge.

Id.

Plaintiffs further argue that these productions themselves, although a subset of the total claims data, nonetheless represent the very source data required by Rule 1006, as "they are *the data* that the company store on authorizations, claims, and payments . . . . Moreover, Plaintiffs extracted this data from their accounting system without any alteration to the columns of claim information . . . produced." Pls.' Opp'n 17 (emphasis in original).

Defendant has not demonstrated that Plaintiffs' productions are summaries controlled by Federal Rule of Evidence 1006. The Rule provides that:

>The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006. "[T]he rules recognize that the preparation of summaries from other documents carries risks of error or distortion that must be guarded against by giving the opposing party an opportunity to review and object to the underlying documents." Conoco Inc. v. Dep't of Energy, 99 F.3d 387, 393 (Fed. Cir. 1996). Where the proponent of a summary does not properly comply with Rule 1006, the summary will be excluded as evidence. See PR

Contractors, Inc. v. United States, 69 Fed. Cl. 468, 472 (2006); Jade Trading, LLC v. United States, 67 Fed. Cl. 608, 615 (2005).

Plaintiffs have established that their produced data were not summaries of other underlying data, but were themselves information stored in the ordinary course of business and assembled in a workable format for production. See Rose Decl. ¶ 4. Contrary to Defendant's suggestion, there is no risk of "error or distortion" in Plaintiffs' produced data. See Conoco, 99 F.3d at 393. Because Plaintiffs' data encompasses the same content as in Plaintiffs' data warehouse, Plaintiffs' December 3, 2013, November 18, 2014, and November 26, 2014 productions are not summaries under Rule 1006 and are not subject to exclusion for failure to produce the underlying data.

## Conclusion

1. Defendant's motion in limine is **DENIED**. The data produced by Plaintiffs in the December 19, 2014, January 16, 2015, January 28, 2015, and March 17, 2015 productions are not excluded from the record. Nor are Plaintiffs' December 3, 2013, November 18, 2014, and November 26, 2014 claims data productions excluded.

    a. Both parties may supplement their expert reports to the extent necessary to address Plaintiffs' supplemental productions.

    b. The parties shall file within 15 days a suggested schedule for the close of expert discovery.

    c. The dispositive motions before this Court, previously stayed, are now reopened. If either party wishes to supplement its briefing on the outstanding dispositive motions based on this ruling, it shall file a motion seeking leave of the Court within the next 15 days.

2. Plaintiffs' motion to quash Defendant's subpoena duces tecum is **GRANTED**.

3. Plaintiffs' motion for a protective order prohibiting a party from filing a motion to compel documents made known before fact discovery closed is **DENIED**.

4. Defendant's cross-motion to affirm Plaintiffs' duty to comply with the subpoena duces tecum is **DENIED**.

5. Defendant's cross-motion to affirm Plaintiffs' continuing obligation to comply with Rule 26 is **DENIED** as unnecessary.

6. Defendant's motion for leave to file a motion addressing Plaintiffs' failure to comply with the subpoena and continuing discovery obligations is **DENIED** without prejudice for lack of clarity.  In the event Defendant believes Plaintiffs have failed to comply with its discovery requests, it shall file a notice to the Court separately listing each such discovery request and each alleged failure to respond in numbered paragraphs. Defendant's Notice shall be filed by **February 22, 2016**.  No extensions will be granted. Within 10 days of filing such Notice, Defendant may file a motion for leave to file a motion to compel discovery and any related relief, specifying the precise relief it seeks.

s/Mary Ellen Coster Williams<br>**MARY ELLEN COSTER WILLIAMS**<br>**Judge**